[Cite as *State v. Mattox*, 2025-Ohio-239.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State of Ohio,                             :

      Plaintiff-Appellee,          :

                                             No. 24AP-186

v.                                  :         (C.P.C. No. 23CR-1442)

Mark W. Mattox,                :           (REGULAR CALENDAR)

      Defendant-Appellant.      :

                                           :

---

D E C I S I O N

Rendered on January 28, 2025

---

**On brief:** [*Shayla D. Favor*], Prosecuting Attorney, and *Kimberly M. Bond*, for appellee. **Argued:** *Kimberly M. Bond.*

**On brief:** *Zeiger Tigges & Little*, and *Ronald J. O'Brien*, for appellee A.G. **Argued:** *Ronald J. O'Brien.*

**On brief:** *Brian J. Rigg*, for appellant.

---

APPEAL from the Franklin County Court of Common Pleas

MENTEL, J.

{¶ 1} A jury convicted defendant-appellant, Mark W. Mattox, of theft from a person in a protected class under R.C. 2913.02(B)(3), a first-degree felony, after he withdrew and gambled away over $450,000 from his elderly aunt's bank accounts. Mr. Mattox appeals from the judgment of the Franklin County Court of Common Pleas entering his conviction and sentence. Finding no merit to his claims of error, we affirm the trial court's judgment.

## I. Factual and Procedural Background

{¶ 2} A grand jury indicted Mr. Mattox on one count of theft in violation of R.C. 2913.02, alleging that he had stolen over $150,000 from his aunt, A.G. (Mar. 22, 2023

Indictment.)  The state subsequently amended the indictment to clarify that "the victim of the offense [was] an elderly person," a person in a protected class under R.C. 2913.02(B)(2). (Mar. 23, 2023 Mot.; Apr. 14, 2023 Entry.)  The victim's status and the alleged amount of the stolen funds elevated the offense to a first-degree felony.  *See* R.C. 2913.02(B)(2).  Mr. Mattox entered a plea of not guilty and the case proceeded to trial.  (Apr. 17, 2023 Plea.)

{¶ 3}  At trial, A.G. testified that she had lived in Columbus for over 50 years. (Dec. 5, 2023 Tr. Vol. 2 at 142.) At the time of trial, she was 76 years old. *Id*. at 143.  In 2019, at the age of 72, she was diagnosed with kidney cancer. *Id*. at 142-43.  After the diagnosis, A.G. went to Virginia to live with her sister while she received treatment because she "had no other family" in Columbus. *Id*. at 145. A.G.'s "only family" in Columbus was Mr. Mattox, whose mother was her second cousin. *Id*.

{¶ 4}  Before she moved for treatment, Mr. Mattox would "come over" and do "different things to help" her. *Id*. at 146.  He suggested setting up online bill pay to pay her utility bills while she was gone. *Id*.  A.G. and her deceased husband had always paid their bills in cash or with money orders, and she had never used a credit or debit card. *Id*. at 146-47.  Before she left, Mr. Mattox "would come over and he would show" her the bills online, demonstrating that they "were paid." *Id*. at 146.  At that time, A.G. considered Mr. Mattox "family and a friend." *Id*. at 147.

{¶ 5}  A.G. had intended to return home to Columbus after treatment. *Id*. at 148.  In the meantime, Mr. Mattox was to pay her bills and "take care" of her home. *Id*.  Before leaving, she went to the bank with Mr. Mattox to withdraw $50,000 for her sister for living expenses during her treatment, and to place another $50,000 in a CD. *Id*.  She wanted to place $50,000 into a CD because it had a higher rate of return than her money market account. *Id*. at 149-50.  A.G. testified that the "banker" who opened the CD stated that "whoever sign[s] this, it has to be in person" because her sister was its beneficiary. *Id*. at 149-50.  Mr. Mattox said "no problem, I got you," after which he "signed the CD and we left the bank." *Id*.  The next day, A.G. went to Virginia. *Id*. at 149.  When asked what kind of "agreement" she had with Mr. Mattox regarding her money, A.G. replied:

> None. The only thing he was allowed to do, and he agreed and he understood that, he was just to pay my bills when they came in and that was it. When I returned none of my bills had been paid for the last year. I had no insurance paid on my house, I

had no insurance paid on the real estate, my taxes, and there
was no insurance on my cars.

*Id.* at 151.

**{¶ 6}** A.G. remembered signing the check for the cash for her sister and signing for the CD. *Id.* at 156. In her recollection, Mr. Mattox only cosigned on the CD because the bank representative told A.G. that "whoever signs has to be in person." *Id.* A.G. testified that she never authorized Mr. Mattox to sign on either her checking or money market accounts. *Id.* at 172.

**{¶ 7}** A.G. was shown a withdrawal slip from November 18, 2019, the day she went to the bank with Mr. Mattox to withdraw the $50,000 for living expenses and to transfer $50,000 into the CD. *Id.* at 159. The withdrawal slip was for a $10,000 withdrawal that same day. *Id.* A.G. testified that the signature on it was not hers. *Id.* She did identify her signature on the withdrawal slips for the two $50,000 transactions she had authorized. *Id.* at 161-62.

**{¶ 8}** A.G. only realized that there might be a problem when she received letters from Social Security and her retirement account informing her that deposits were not going through because her bank account had been closed. *Id.* at 163-64. She called Mr. Mattox, who told her that he "was going over [to] take care of it right now." *Id.* at 164. He told A.G. that he had "moved money from the checking account" and said he "should have talked to" her before doing so, but hadn't. *Id.* A.G. responded that he "had no right to touch anything belonging to" her apart from paying her bills. *Id.* Mr. Mattox claimed that he was going to recover the money and mail it to her. *Id.* at 167. This "never happened." *Id.* at 169-70.

**{¶ 9}** After calling the bank and going in to review the bank's records, A.G. realized that all of her money "was cleared out," and that Mr. Mattox had taken all of it. *Id.* at 165. A.G. testified that Mr. Mattox "took every dime I had. And for years, I worked all these years, and if I would pass away today, and my sister would pass away, I won't even have money to bury myself. My husband worked years to put this money away, so that we would be taken care of[.]" *Id.*

**{¶ 10}** According to A.G., Mr. Mattox blocked her number, but he also spoke to her sister and blamed his stepson for the missing funds. *Id.* at 166.

{¶ 11} M.M. is A.G.'s sister. *Id.* at 193. She testified that A.G. came to live with her in Virginia while being treated for cancer. *Id.* She was involved in the "conversation" with Mr. Mattox about what had happened to A.G.'s money after Social Security informed A.G. that her bank account had been closed. *Id.* at 195. In her recollection, "[t]he conversation just kept going on for days," with repeated obfuscations by Mr. Mattox. *Id.* At one point, he claimed to be "at the post office" mailing A.G. her money back and promising to send them the tracking number. *Id.* at 195-96. She recalled Mr. Mattox blaming his stepson and claiming to "cover" for him. *Id.* at 196.

{¶ 12} M.M. also testified that Mr. Mattox sent a statement from his retirement account, which "had something like $350,000 in it," and claimed that he would be able to withdraw funds in "three to five days" to repay A.G. *Id.* The money never came. *Id.* "Every day it was another excuse" from Mr. Mattox. *Id.* M.M. recalled that eventually, Mr. Mattox said: "I don't care what you all do, I was entitled to it, you do what you want to do." *Id.* at 197. M.M. informed Mr. Mattox that they were going to hire a lawyer. *Id.* "At that point we cut off all conversation." *Id.*

{¶ 13} Matthew Cook, a detective in the economic crimes unit of the Columbus Department of Police, testified about the investigation that began after A.G. filed a police report. *Id.* at 60-61. Detective Cook reviewed documentation supplied by her attorney, then obtained subpoenas for KeyBank's records of A.G.'s CD account, money market account, and checking account for November 2019 to August 2022. *Id.* at 61-62.

{¶ 14} Detective Cook explained a bank record showing multiple cash withdrawals from the CD account by Mr. Mattox totaling over $45,000 between March 1, 2021 and August 8, 2022. *Id.* at 65. He also explained money market account records showing A.G.'s withdrawal of $50,000 to open the CD account and $50,000 to take to Virginia on November 18, 2019. *Id.* at 66. Beginning on January 7, 2020, Mr. Mattox made multiple withdrawals from the money market account. *Id.* at 66. By January of 2020, records showed Mr. Mattox had already transferred over $100,000 from A.G.'s money market account to her checking account, from which he made withdrawals. *Id.* at 79.

{¶ 15} Detective Cook also obtained records from Hollywood Casino showing that Mr. Mattox used a debit card from A.G.'s checking account there. *Id.* at 89. The casino also supplied the investigation with a photograph of Mr. Mattox "sitting at a table" there on

December 13, 2020. *Id.* at 90. Similar records from an Indiana casino showed Mr. Mattox's use of the debit card there, as well as a photo of him on the premises. *Id.* at 92-93. Bank records showed numerous cash advance withdrawals, many of which occurred from ATMs at casinos. *Id.* at 94-95.

{¶ 16} Detective Cook prepared several spreadsheets to detail the transactions from A.G.'s accounts. A spreadsheet showed transactions from her checking account from November of 2019 until August of 2022. (State's Ex. H-2.) The spreadsheet differentiated between "authorized withdrawals" for utility and insurance payments from "large withdrawals at a branch" and withdrawals at casinos. (Tr. at 109.) The figures were obtained from A.G.'s checking account statements. *Id.* at 111. After accounting for deposits and authorized transactions to pay bills, Mr. Mattox had withdrawn a total of $201,638.13 from A.G.'s checking accounts. *Id.* at 115. The bank closed the account with a zero balance on August 19, 2022. *Id.*

{¶ 17} Detective Cook also presented a spreadsheet detailing transactions from A.G.'s money market account. (State's Ex. H-3.) After accounting for A.G.'s two $50,000 transactions, the total amount withdrawn from the money market account by Mr. Mattox totaled $200,804.34. *Id.* at 122. After accounting for the unauthorized withdrawals from the CD account, Detective Cook calculated A.G.'s total loss at $453,132. *Id.* at 123.

{¶ 18} During the investigation, Detective Cook interviewed Mr. Mattox, who he described as "accommodating." *Id.* at 97. An audio recording of the interview was played for the jury. (State's Ex. F.) During the interview, Mr. Mattox admitted to making the withdrawals that Detective Cook asked him about. *Id.* (*See also* Tr. at 112.)

{¶ 19} Mr. Mattox called two witnesses in his defense. First, he called N.A., a KeyBank branch manager, to testify. (Tr. at 232.) She testified that on November 18, 2019, her title at the bank was "Financial Wellness Consultant," which involved opening and servicing accounts for clients. *Id.* at 232-33. She testified that KeyBank allowed joint account holders on CD, checking, and money market accounts. *Id.* at 234. N.A. described a joint account as "when both co-owners have full access to the account, each can make [withdrawals], deposits, write checks, independent of each other, but they do not have to be there together." *Id.* at 235.

{¶ 20} N.A. testified that joint account holders are each "titled co-owner" of an account and jointly own the property. *Id.* at 235-36. In order to form a joint account, parties must come into the bank and both sign a signature card. *Id.* at 237. The process cannot happen online because the bank must "verify identity." *Id.*

{¶ 21} N.A. identified the signature card, or "account express claim," used to make Mr. Mattox and A.G. joint account holders of the CD account. *Id.* at 255-56. However, the bank had no signature cards for the other accounts, although Mr. Mattox was made a joint holder of each. *Id.* at 309.

{¶ 22} The defense also called R.O., an attorney representing A.G., to testify. *Id.* at 346. He testified that he drafted an affidavit for A.G. to sign on October 19, 2022, the same day that they met with an official from KeyBank and received records from her account. *Id.* at 347. At that time, the official presented to them that A.G. had allowed Mr. Mattox to be a joint account holder on all her accounts, and R.O. drafted an affidavit for her stating that fact. *Id.* at 347-48. Subsequently, however, KeyBank could never produce the signature card authorizing Mr. Mattox to be a joint account holder for the checking or money market accounts, only the CD. *Id.* at 353. R.O. had attempted for 14 months to obtain signature cards for those accounts but KeyBank could not provide them. *Id.* at 358. The affidavit was drafted with the knowledge they had that day, but was inconsistent with R.O. and A.G.'s current knowledge and belief that she had never authorized Mr. Mattox as a joint account holder on any account except the CD account. *Id.* at 360.

{¶ 23} The jury returned a guilty verdict on the theft charge and the trial court sentenced Mr. Mattox to an indefinite prison term of five to seven and a half years. (Feb 5, 2024 Jgmt. Entry.)

{¶ 24} Mr. Mattox has appealed and asserts the following assignments of error:

> [I.] The trial court erred when it denied Mark W. Mattox's Rule 29 Motion for Acquittal.
>
> [II.] The trial court erred when it denied Mark. W. Mattox's fair trial rights to a unanimous verdict.
>
> [III.] The verdict[] of guilt as to the count of theft [was] against the manifest weight of the evidence.

## II.  Analysis

{¶ 25}  We will first consider the first and third assignments of error together, and then separately address the second assignment of error.

### A.  First and Third Assignments of Error

{¶ 26}  In the first assignment of error, Mr. Mattox asserts that the trial court erred by denying his motion for acquittal under Crim.R. 29, which "is governed by the same standard as the one for determining whether a verdict is supported by sufficient evidence." *State v. Tenace*, 109 Ohio St.3d 255, 2006-Ohio-2417, ¶ 37, citing *State v. Carter*, 72 Ohio St.3d 545, 553 (1995) and *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997).  In the second assignment of error, he argues that the jury's verdict was against the manifest weight of the evidence.

{¶ 27}  Because "[t]he legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different," they require two different legal standards.  *Thompkins*, paragraph two of the syllabus.  To test the evidence for legal sufficiency, a reviewing court asks "whether the evidence presented, when viewed in a light most favorable to the prosecution, would allow any rational trier of fact to find the essential elements of the crime beyond a reasonable doubt."  *State v. Dent*, 163 Ohio St.3d 390, 2020-Ohio-6670, ¶ 15, citing *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus, *superseded by constitutional amendment on other grounds as stated in State v. Smith*, 80 Ohio St.3d 89, 102 (1997), fn. 4.  Legal sufficiency is a question of law that asks whether the state's evidence passes a "test of adequacy."  *Thompkins* at 386.  A conviction resulting from "legally insufficient evidence constitutes a denial of due process."  *Id.*, citing *Tibbs v. Florida*, 457 U.S. 31, 45 (1982) ("the Due Process Clause forbids any conviction based on evidence insufficient to persuade a rational factfinder of guilt beyond a reasonable doubt").  A reviewing court "will not disturb a verdict on appeal on sufficiency grounds unless 'reasonable minds could not reach the conclusion reached by the trier-of-fact.' " *State v. Ketterer*, 111 Ohio St.3d 70, 2006-Ohio-5283, ¶ 94, quoting *State v. Dennis*, 79 Ohio St.3d 421, 430 (1997).

{¶ 28}  The manifest weight of the evidence standard of review requires the appellate court to consider the state's evidence as an additional, or "thirteenth juror."  *Thompkins* at

387. "To evaluate a claim that a jury verdict is against the manifest weight of the evidence, we review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that we must reverse the conviction and order a new trial." *State v. Wilks,* 154 Ohio St.3d 359, 2018-Ohio-1562, ¶ 168, citing *Thompkins* at 387. Reversal on manifest weight grounds is appropriate " 'only in the exceptional case in which the evidence weighs heavily against the conviction.' " *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983.).

{¶ 29} In relevant part, R.C. 2913.02(A) defines the offense of theft as follows:

> No person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services in any of the following ways:
>
> (1) Without the consent of the owner or person authorized to give consent;
>
> (2) Beyond the scope of the express or implied consent of the owner or person authorized to give consent; [or]
>
> (3) By deception * * *.[1]

{¶ 30} Thus, the state was required to prove that Mr. Mattox 1) knowingly obtained or exerted control over A.G.'s money, 2) with purpose to deprive her of it, and that he did so either by acting 3) without her consent, beyond the scope of her express or implied consent, or by deception. When viewed in a light most favorable to the prosecution, the state's evidence would allow any rational jury to find each of these elements beyond a reasonable doubt.

{¶ 31} First, the state presented sufficient evidence to show that Mr. Mattox knowingly obtained or exerted control over A.G.'s money. "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature." R.C. 2901.22(B). The state

---

[1] The statute also allows theft to be proven by threat under R.C. 2913.02(A)(4) or by intimidation under R.C. 2913.02(A)(5), but Mr. Mattox was not accused of committing theft based on either. (*See* Mar. 22, 2023 Indictment.)

presented extensive records of withdrawals at bank branches and ATMs showing that Mr. Mattox withdrew large sums of cash from A.G.'s CD, money market, and checking accounts. (*See* State's Ex. A (bank records), Ex. B (bank records), Ex. E (debit card transactions).) By withdrawing cash from these accounts, Mr. Mattox obtained it and exerted control over it. Apart from the extensive bank records detailing the withdrawals, Mr. Mattox admitted withdrawing the money to Detective Cook, as well as to A.G. and to her sister. (*See* State's Ex. F (audio interview with Mr. Mattox); Tr. at 164 and 197.)

{¶ 32} The state's evidence was also legally sufficient to prove that Mr. Mattox acted with purpose to deprive A.G. of her money. "A person acts purposely when it is the person's specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is the offender's specific intention to engage in conduct of that nature." R.C. 2901.22(A). Because intent exists "within the privacy of a person's own thoughts, is not susceptible of objective proof." *State v. Garner*, 74 Ohio St.3d 49, 60 (1995). Thus, intent may "be determined from the surrounding facts and circumstances, and persons are presumed to have intended the natural, reasonable and probable consequences of their voluntary acts." *Id.* As detailed previously, the state had extensive evidence that Mr. Mattox made large cash withdrawals from A.G.'s accounts, including bank records and his own admission. Each time that Mr. Mattox withdrew cash from A.G.'s accounts, he is presumed to have intended the natural consequence of the act, which was to deprive A.G. of her money. Furthermore, Mr. Mattox gambled away all of A.G.'s money. Each time he placed a bet with A.G.'s money, a natural consequence of the act was to lose it forever. He is presumed to have intended the natural consequences of his actions. *See id.* A rational jury could conclude that he had the specific intention to cause this result, and that he therefore acted purposely. Accordingly, the state's evidence was legally sufficient to prove this element of theft.

{¶ 33} Mr. Mattox argues to the contrary, asserting that he "did not have the intention to permanently deprive [A.G.] of her property," citing the testimony of N.A., the KeyBank manager who testified that he had "unrestricted access" to the account as a joint account holder. (Brief of Def. at 13.) In his view, his status as "a joint owner" shows that

he had "legal entitlement to the funds in the account, despite his actions in temporarily withholding and using a significant portion of its value for himself." *Id.*

{¶ 34} Mr. Mattox's status as a joint account holder has no bearing on whether the state had legally sufficient evidence to prove that he intended to deprive A.G. of her money. He may have been legally entitled to make account withdrawals, but he was not legally entitled to do so with the intent to purposely deprive A.G. of her money. Her consent to the use of her funds only extended to paying her bills. The state's evidence showed that he harbored the intent to deprive her of the money permanently, and there is no basis for his assertion that he "temporarily" withheld the money.

{¶ 35} Furthermore, many persons with legal access to funds use them improperly. *E.g.*, *State v. Fissel,* 1st Dist. No. C-210483, 2022-Ohio-1856, ¶ 2 (affirming theft conviction where employee "abused her position of trust by forging checks to herself, endorsing them with the company's signature stamp, and depositing them into her personal account"); *Disciplinary Counsel v. Hunter*, 106 Ohio St.3d 418, 2005-Ohio-5411, ¶ 2-3, 20 (disbarring attorney who withdrew money from a guardianship estate "for her own use through several bank counter checks totaling over $ 83,000, ATM transactions totaling an estimated $ 27,000, and 38 other checks totaling over $80,000," all originating "from a $186,000 certificate of deposit belonging to her ward," an "embezzlement" that "resulted in her conviction of felony theft in violation of R.C. 2913.02"). Mr. Mattox's status as an authorized user of A.G.'s accounts facilitated his act of theft. It does not exonerate his actions, provide an affirmative defense, or demonstrate that the state's evidence, which was overwhelming, lacked sufficiency.

{¶ 36} Furthermore, as the state points out, a conviction for theft under R.C. 2913.02(A) may arise from a joint account holder's actions depriving another holder of funds. *State v. Nye*, 6th Dist. No. WD-20-058, 2021-Ohio-2557 (affirming conviction for theft where defendant withdrew $12,000 from joint savings account that his ex-wife mistakenly believed the bank had removed him from); *State v. Warrix*, 2d Dist. No. 26556, 2015-Ohio-5390, ¶ 34 (affirming trial court's denial of motion to withdraw guilty plea where defendant "could not raise a viable defense that the existence of the joint and survivorship accounts permitted her to spend the money" in them because they were funded solely by her mother); *State v. Woodburn*, 4th Dist. No. 18CA891, 2019-Ohio-2757,

¶ 2 (reversing conviction under R.C. 2913.02(A)(1) based on legally insufficient evidence where "the state presented no evidence that [defendant] obtained or exerted control over the funds in the joint account without her mother's consent," but affirming conviction under R.C. 2913.02(A)(2) "because the evidence supported a finding that she exceeded the scope of consent when she used her mother's funds for personal expenses"). Each of the foregoing criminal cases applied the Supreme Court of Ohio's discussion of the evidentiary burden required to prove ownership of funds in a joint bank account in *Estate of Cowling v. Estate of Cowling*, 109 Ohio St.3d 276, 2006-Ohio-2418, ¶ 12:

> "The existence of a joint and survivorship bank account raises a rebuttable presumption that co-owners of the account share equally in the ownership of the funds on deposit." *Vetter v. Hampton* (1978), 54 Ohio St.2d 227, 8 O.O.3d 198, 375 N.E.2d 804, paragraph three of the syllabus. This presumption applies in the absence of evidence to the contrary. *Id.* at paragraph four of the syllabus; see *Wright v. Bloom* (1994), 69 Ohio St.3d 596, 602-603, 1994 Ohio 153, 635 N.E.2d 31. "A joint and survivorship account belongs, during the lifetime of all parties, to the parties in proportion to the net contributions by each to the sums on deposit, unless there is clear and convincing evidence of a different intent." *In re Estate of Thompson* (1981), 66 Ohio St.2d 433, 20 O.O.3d 371, 423 N.E.2d 90, paragraph one of the syllabus; see Uniform Probate Code 6-103. We expressly stated that *Thompson* did not "significantly alter our earlier case law" but merely amended our analytic framework to better effectuate "the intent of the parties to create joint and survivorship accounts." *Thompson,* 66 Ohio St.2d at 439, 20 O.O.3d 371, 423 N.E.2d 90. This language indicates that, although we adopted a new presumption for determining ownership of joint and survivorship accounts, the presumption of equal ownership continues to exist when net contributions are not proven. See Uniform Probate Code 6-103, Official Comment (courts should "divide the account equally among the parties to the extent that net contributions cannot be proven").

{¶ 37} In this case, there was no evidence that Mr. Mattox ever deposited any funds into any of A.G.'s accounts. A.G. testified that she and her husband had saved the money in the accounts: "I worked 35 years on one job, my husband worked the same, and we banked money, we saved our money." (Tr. at 150.) Within the time period of Mr. Mattox's theft, the only deposits to the accounts were "monthly deposits into her account for her

Ohio OPERS account, retirement, her Merrill Lynch account, Social Security," according to Detective Cook.  *Id.* at 83.  This evidence was sufficient to rebut any presumption that Mr. Mattox shared equally in ownership of the account funds.

{¶ 38}  In addition, the evidence was legally sufficient to show that Mr. Mattox acted without A.G.'s consent, beyond the scope of her express or implied consent, or by deception.  A.G. stated unequivocally that she had never consented that Mr. Mattox do anything other than pay her bills while she was in Virginia.  Withdrawing over $450,000 to gamble at casinos was not within the scope of her consent.  The evidence demonstrated Mr. Mattox's ongoing deception as well.  A.G. testified: "He assured me every time I talked to him that he was taking care of all of my bills and he was taking care of my house."  *Id.* at 148.  Although Mr. Mattox visited A.G. in Virginia once every week or two, "[h]e brought [her] no statements" from the bank and claimed there "was nothing but junk mail, nothing to bring."  *Id.* at 153.  Her testimony, as well as that of her sister, presented evidence of Mr. Mattox's attempts to deceive them about the missing funds.  He claimed that he had moved money around, then blamed the missing money on his stepson, and then claimed that he was repaying the money with his retirement account.  Their testimony about these statements was legally sufficient to show that Mr. Mattox was deceiving A.G. while pilfering and gambling away her life savings.

{¶ 39}  Finally, the state's evidence was legally sufficient to satisfy the statutory requirements to prove theft of a person in a protected class as a first-degree felony.  If a victim of the theft offense is "an elderly person," the offender commits theft from a person in a protected class.  R.C. 2913.02(B)(3).  The relevant definition of and elderly person is "a person who is sixty-five years of age or older."  R.C. 2913.01(CC).  Here, A.G. testified that she was 72 in 2019, the year that the theft began.  (Tr. at 142-43.)  The evidence therefore met the statutory definition of an elderly person.  Furthermore, the state introduced extensive bank records showing the amount of money withdrawn from her accounts, as well as Mr. Mattox's admission during his interview with Detective Cook, to prove that the amount of stolen funds exceeded $450,000.  This amount far exceeded the $150,000 amount required to elevate theft of a person in a protected class to a first-degree felony under R.C. 2913.02(3).

{¶ 40} In this case, the state's evidence passes "a test of adequacy," as it would allow any rational jury to convict Mr. Mattox of theft on each of the elements of the crime as charged in the indictment. *Thompkins* at 386. Accordingly, we conclude that the evidence was legally sufficient, and his first assignment of error is therefore overruled. Furthermore, our review of the record reveals no indication that the jury lost its way or created any "manifest miscarriage of justice" when weighing the evidence presented by the state. *Wilks* at ¶ 168. He has pointed to no contradiction the state's evidence or credibility problem with the state's witnesses to support reversal on manifest weight grounds. *Wilks* at ¶ 168. Finding no merit to Mr. Mattox's assertion that the manifest weight of the evidence did not support his conviction, we overrule the third assignment of error as well.

## B. Second Assignment of Error

{¶ 41} In the second assignment of error, Mr. Mattox argues that the trial court erred by denying his motion to sever the single theft charge into three different ones, potentially violating his right a unanimous jury under the Sixth Amendment to the United States Constitution. His contention arises from the manner in which the state presented the theft charge in the indictment, which alleged that he committed the offense "without the consent of the owner or person authorized to give consent and/or beyond the scope of the express or implied consent of the owner or person authorized to give consent and/or by deception." (Mar. 22, 2023 Indictment.) By presenting the offense to the jury as provable by any of the foregoing means, he argues that the trial court "potentially compromised the requirement that each offense be proven beyond a reasonable doubt to all jurors individually." (Brief of Def. at 18-19.) Although his trial counsel moved to have the theft account presented as three separate ones in the jury instructions, it overruled the motion.

{¶ 42} Initially, we note that Mr. Mattox incorrectly assumes that the Sixth Amendment's guarantee of a unanimous jury verdict applies to his conviction. As the Supreme Court of Ohio explained in *State v. Gardner*, 118 Ohio St.3d 420, 2008-Ohio-2787, ¶ 35: "The Sixth Amendment guarantee of a jury trial requires unanimity in a federal criminal trial, but the high court has never held that this requirement applies to the states through the Fourteenth Amendment." Instead, the requirement of jury unanimity under Ohio law arises under Crim.R. 31(A), which states that a jury's "verdict shall be unanimous."

{¶ 43} *Gardner* further states:

> In determining whether the state has impermissibly interfered with a defendant's Crim.R. 31(A) right to juror unanimity and the due process right to require that the state prove each element of the offense beyond a reasonable doubt, the critical inquiry is whether the case involves "alternative means" or "multiple acts."

*Id.* at ¶ 48.

{¶ 44} In *Gardner*, the Supreme Court of Ohio adopted the test set forth in *State v. Jones*, 96 Haw. 161, 170 (2001), to determine whether an offense as charged interferes with a defendant's right to jury unanimity under Crim.R. 31(A):

> In an alternative means case, where a single offense may be committed in more than one way, there must be jury unanimity as to guilt for the single crime charged. Unanimity is not required, however, as to the means by which the crime was committed so long as substantial evidence supports each alternative means. In reviewing an alternative means case, the court must determine whether a rational trier of fact could have found each means of committing the crime proved beyond a reasonable doubt.
>
> In multiple acts cases, on the other hand, several acts are alleged and any one of them could constitute the crime charged. In these cases, the jury must be unanimous as to which act or incident constitutes the crime. To ensure jury unanimity in multiple acts cases, we require that either the State elect the particular criminal act upon which it will rely for conviction, or that the trial court instruct the jury that all of them must agree that the same underlying criminal act has been proved beyond a reasonable doubt.

*Id.* at ¶ 49-50.

{¶ 45} In this case, both the statutory definition of theft under R.C. 2913.02(A) and the offense at the indictment charged it to Mr. Mattox in the indictment allowed for the "single offense [to] be committed in more than one way," satisfying the alternative means test. *Id.* at ¶ 49. Under R.C. 2913.02(A), the act of obtaining or exerting control over another's property may be shown "in any of the following ways: (1) Without the consent of the owner or person authorized to give consent;(2) Beyond the scope of the express or implied consent of the owner or person authorized to give consent; [or] (3) By deception

* * *." Echoing these alternatives, the indictment charged Mr. Mattox with purposely depriving A.G. of her money, and knowingly obtaining it or exerting control over it "without the consent of the owner or person authorized to give consent and/or beyond the scope of the express or implied consent of the owner or person authorized to give consent and/or by deception." (Mar. 22, 2023 Indictment.) Furthermore, the state introduced substantial evidence to support each of these alternative means such that a rational jury could have found each alternative means of committing theft beyond a reasonable doubt, as illustrated in the foregoing discussion overruling Mr. Mattox's third assignment of error. *See Gardner* at ¶ 49.

{¶ 46} "Although Crim.R. 31(A) requires juror unanimity on each element of the crime, jurors need not agree to a single way by which an element is satisfied." *Gardner* at ¶ 38, citing *Richardson v. United States*, 526 U.S. 813, 817 (1999). In this case, jurors unanimously concluded that Mr. Mattox was guilty of theft. (Dec. 7, 2023 Verdict.) Mr. Mattox's right to a fair trial was upheld when every juror concluded that he had acted purposely acted purposely and knowingly to obtain A.G.'s life savings, and done so without her consent, beyond the express consent she gave, or by deception.

{¶ 47} Finally, we note that there are two sets of jury instructions filed in the record. The first, filed on December 6, 2023, presents the theft charge as one count. However, a second set, filed on January 29, 2024, presents three charges of theft, in the form argued for by Mr. Mattox's attorney at trial. The record does not expressly state which set was provided to the jury, but the first set corresponds to the instructions read aloud to the jury before its deliberations. Thus, either the jury received the instructions presenting one count of theft, which was not erroneous, or it received them in the form argued for by Mr. Mattox's counsel. Although we cannot resolve the ambiguity in the record before us, it presents no error that Mr. Mattox may complain of on appeal. Accordingly, the second assignment of error is overruled.

## III. Conclusion

{¶ 48} Based on the foregoing, we conclude that Mr. Mattox has presented no basis to challenge his conviction for theft of a person in a protected class based on the weight of the evidence, its legal sufficiency, or any a violation of the jury unanimity required by

Crim.R. 31(A).  Accordingly, we overrule the three assignments of error and affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

LUPER SCHUSTER and EDELSTEIN, JJ., concur.

_____