**[Cite as *State v. Jones*, 2026-Ohio-634.]**

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
ERIE COUNTY

State of Ohio                                    Court of Appeals No. E-25-012

        Appellee

                                   Trial Court No. 2023 CR 0413

v.

Tara Jones                                       **DECISION AND JUDGMENT**

        Appellant                           Decided:  February 24, 2026

* * * * *

Kevin J. Baxter, Prosecuting Attorney and
Kristin R. Palmer, Assistant Prosecuting Attorney, for appellee

David L. Doughten, for appellant

* * * * *

**DUHART, J.**

{¶ 1} Appellant, Tara Jones, appeals from a judgment entered by the Erie County Court of Common Pleas convicting her, following a jury trial, of grand theft, aggravated theft, tampering with evidence, and intimidation. For the reasons that follow, the trial court's judgment is affirmed.

**Statement of the Case**

{¶ 2} On December 28, 2023, the Erie County grand jury indicted Jones in a four-count indictment charging her with: (1) one count of grand theft, in violation of R.C. 2913.02(A)(2) and (B)(2), a fourth-degree felony; (2) one count of aggravated theft, in violation of R.C. 2913.02(A)(3) and (B)(2), a third degree felony with a forfeiture specification pursuant to R.C. 2941.1417(A); (3) one count of tampering with evidence, in violation of R.C. 2921.12(A)(2) and (B), a third degree felony; and (4) one count of intimidation, in violation of R.C. 2921.03(A) and (B), a third degree felony.

{¶ 3} The case proceeded to a jury trial, after which the jury returned a verdict of guilty on each count, including the forfeiture specification.

{¶ 4} At sentencing, the trial court sentenced Jones to community control sanctions for a period of five years. The court ordered forfeiture of the property pursuant to the specification and that Jones make restitution to R.W. in the amount of $47,000.00.

**Statement of the Facts**

{¶ 5} This case arises from the theft of funds and real property by Jones from her ailing alcoholic father, R.W. For many years, R.W.'s half-sister, Mary Meijer, served as the power of attorney ("POA") for R.W.'s father. With Mary's help, R.W.'s father paid most of R.W.'s bills. When R.W.'s father died in January 2022, R.W. received as an inheritance two payments -- one in the amount of $23,224.70 and another in the amount of $15,314.09. R.W. also received the deed to his father's home on Maple Ave., where R.W. had lived most of his life. Following R.W.'s father's death, Mary talked to R.W.

2.

about naming one of his children to be R.W.'s POA. Mary determined that R.W. would need a POA, because R.W. was unable to manage his own financial obligations, mainly due to his alcoholism. In addition to alcoholism, R.W. suffered from bladder cancer and depression. And although competent, R.W. was known to have memory issues. R.W. decided that his daughter, Tara Jones, should be his POA, because his son, Ross, was living out of state.

{¶ 6} Jones testified that when she agreed to be her father's POA, she did not really know what that meant, other than that she "had the right to sign things…if need be." Mary testified that she had told Jones that as POA, Jones would need to help her father with paying his bills and would need to "oversee him and, you know, keep him on the straight and narrow." Notably, in a March 25, 2022 email, Jones expressly asked the attorney who was preparing the POA whether R.W.'s "POA form" would "work for his financial POA to pay his bills and expenses."

{¶ 7} On March 28, 2022, a number of transactions were executed simultaneously: (1) Jones was appointed as R.W.'s general and medical POA; (2) Jones was deeded the Maple Ave. property where he lived; and (3) Jones was named on R.W.'s joint savings and checking accounts.[1] R.W. testified that all of this was done so that Jones could take

_____

[1] Although both parties deny that Jones acted in reliance on, or pursuant to, the terms of the general POA in relationship to this case, we note that the general POA document, which was entered as an exhibit at trial, provides in paragraph one that Jones, as R.W.'s agent, was appointed to "open, close and maintain accounts of any nature with any financial institution and to make withdrawals from or deposits to any bank, savings association…or other depository in which there [were] funds on deposit to [R.W.'s] credit or against which [he] [could] withdraw; and, in connection therewith, to sign any checks, withdrawal orders, drafts or endorsements for [R.W.] or on [R.W.'s] behalf." The

3.

care of him. Jones herself acknowledged that all of the measures taken on March 28, 2022 were to facilitate her acting as her father's POA, and that she had been aware that the purpose of the POA was to pay her father's bills, and not to enrich herself. As of March 28, 2022, Jones had drawn down nearly all of a $30,000.00 home equity credit line that she and her husband had opened together several years earlier.

{¶ 8} Jones remained her father's POA for the next year, until March 2023. During that year, Jones withdrew and transferred large sums of money from his bank accounts. Specifically, police determined that between April 2022 and March 2023, Jones made unauthorized cash withdrawals and transfers from R.W.'s accounts totaling $36,997.00. (The first $500 was withdrawn on March 29, 2022, the day after she was added to her father's accounts, became R.W.'s POA, and was deeded his home. Within just over two months of that date, Jones had withdrawn or transferred $22,200.00 of her father's money.) At trial, R.W. testified that these withdrawals and transfers were not authorized. Police also determined that Jones had spent $7,429.20 of her father's money on some 183 Amazon purchases that were made during the same April 2022 to March 2023 time period. R.W. testified that, like the cash withdrawals and transfers, those purchases were not authorized. Finally, police identified an additional $2,558.88 in unauthorized purchases that Jones had made using her father's money. Altogether, police

document additionally provides, in paragraph 13, that Jones was appointed to "make gifts on [R.W.'s] behalf…for the benefit of… [his] lineal descendants, and the spouses of [his] lineal descendants (one or more of whom may be serving as [his] Agent), as [his] Agent consider[ed] appropriate." And finally, paragraph 19 of the general POA document provides that Jones was appointed "to compensate…herself for serving as [R.W.'s] Agent…."

4.

determined that during the period in question, Jones made unauthorized use of $47,674.89 of her father's money.

{¶ 9} Jones never provided any information or receipts to show how the money had been used. At trial, she claimed only that her father had told her that if she ever needed help with any of her bills, she could take what she needed from his account. She also stated that her father had instructed her on various occasions to access his account to buy presents for her children. Jones further testified that R.W. had permitted her to transfer large amounts of his money to her bank account in order to prevent him from spending his money foolishly. At trial, however, Jones failed to provide any information as to where those large amounts of money had gone. Agreeing that it would have been prudent to put the money in an account for her father, Jones admitted on cross-examination that she had not done that. By March 2023, R.W. had just $97.98 left in his checking account and $5.18 remaining in his savings account.

{¶ 10} When R.W. realized in March 2023 that all of his money was gone, he went, crying, to his sister Mary's house. In addition to his inheritance checks, R.W. was receiving an estimated $1,800.00 a month in SSI disability benefits that were directly deposited into his account. Upon reviewing R.W.'s bank statement, Mary determined that Jones had been transferring the entirety of those benefits into her own account. Mary helped R.W. open a new bank account, without Jones's name on it, and he transferred his little remaining money into it. He then named Mary and his half-brother, Don Nemitz, his new POAs. Don's wife, Denise, began taking care of R.W.'s finances, keeping all of the receipts and documentation of funds that were spent.

5.

{¶ 11} On April 4, 2023, R.W. brought Mary a lease agreement for his residence that Jones's brother, Ross, had given R.W. to sign. Under the terms of the agreement, R.W. was required to pay rent to Jones in the amount of $1,200.00 per month, with the first payment due immediately. R.W. testified that Ross had told him that it was in R.W.'s "best interest" to sign the lease, and so R.W. did as he was asked. Jones testified that she prepared the lease because she still had to pay for property taxes and insurance on the Maple Ave. residence. She further stated that she and her brother thought it would be in R.W.'s best interest for R.W. to pay her $1,200.00 every month, so that she could put any extra money "aside" in case R.W. needed anything "down the road."

{¶ 12} Concerned about the state of R.W.'s finances, Mary contacted Dan McLaughlin, a volunteer financial elder abuse investigator in an organization known as Serving Our Seniors. Mary met with McLaughlin on April 10, 2023. (At that time, Mary mistakenly believed that Jones had taken as much as $74,000.00 from R.W.) Soon after meeting with Mary, McLaughlin met with R.W. And after meeting with R.W., he met with Jones. McLaughlin testified that at the end of his April 13, 2023 meeting with Jones, he explained to her that any problems that had arisen from her handling of R.W.'s finances could be resolved without the initiation of legal proceedings, but in the absence of such a resolution, the matter would be referred to the sheriff's department and, possibly, the grand jury. McLaughlin asked Jones to contact him by the end of the next day. But he never heard back from Jones, and Jones never returned his calls.

{¶ 13} Instead, on April 14, 2023, Jones's brother, sought R.W.'s signature on a typed letter that Jones and Ross had prepared. The letter stated that R.W. was "dropping

6.

any and all charges" against Jones for "elder abuse or mishandling of [his] finances," and that he had "approved all transactions that [had] occurred" in his "Erie County Community Federal Credit Union accounts." The letter further stated:

> I know that [Jones] has my best interest to pay my bills and complete the maintenance requirements of my equipment and the automobile that I drive. She has made sure that I have a place to live comfortably and with freedom to live my life. She is always helping me. She takes me to doctor appointments, has cleaned my home, cares for my lawn, oil changes and other appoints [sic] such as social security, disability and VA.
>
> She always makes sure that I do not go without and watches over me to help me with my required medications and food. When she took over as POA, she set up trash service for my home, made sure I had running water and propane to heat my home. She makes sure my lights are on and put me on her phone plan to be sure that I had a form of communication. I trust my daughter would never hurt me or endanger me and has my best interest at heart all times and situations, with my finances, health and welfare.

{¶ 14} At the time the letter was presented, R.W. had been without hot water in his home for three months, and the gas bill, which was in Jones's name, was overdue. Once again, Ross told R.W. that it was in his "best interest" to sign the proffered document. R.W. testified that he felt "[v]ery intimidated," because Ross was videotaping him while asking him to sign the letter. Eventually, R.W. did sign it. But at trial, he testified that all of the statements that were contained in the letter were false.

{¶ 15} On April 17, 2023, R.W. filed a petition for a civil protection order ("CPO") against Jones based on the advice of Dan McLaughlin. In the petition, R.W. stated that Jones "was taking [his] disability and money" and that he found out he "had no money left." He further stated that Jones had told him that if he did not pay her, she would sell the house and get him out. Finally, R.W. complained that Jones was "pressing

7.

[him] to sign papers." At trial, R.W. testified that at the time he filed his CPO petition, he no longer wanted his children to come to his house. The court did not issue a CPO ex parte, because there was no physical harm or threat thereof, but the court did set the matter for a pre-trial hearing on April 26, 2023.

{¶ 16} On April 23, 2023, R.W. filed a report with the sheriff's department about items and money that had gone missing from his home while he was out. The same day, he also called the Veteran's Suicide Hotline and, as a result, was taken to the hospital, where he remained for one night. At that time, R.W. had lost a considerable amount of weight and was depressed. Following the April 23, 2023 hospitalization, medical personnel advised R.W. to "avoid contact with daughter Tara."

{¶ 17} At the April 26, 2023 CPO pre-trial hearing, Jones appeared and used as evidence the April 14, 2023 non-prosecution letter that she and her brother had drafted and pressed R.W. to sign. The magistrate asked R.W. whether he wanted to dismiss the petition, and R.W. stated that he did not. In June 2023, R.W. contacted a legal aid attorney, Denise Zanni, who advised him that his complaints would be insufficient to support a protection order because there was no threat of physical harm. R.W. subsequently dismissed the petition on July 21, 2023.

{¶ 18} On April 30, 2023, Jones and Ross presented R.W. with a letter stating that if his rent was not paid by May 4, 2023, Jones would begin eviction proceedings against him. Although eviction proceedings were never initiated, Jones and Ross continued to appear at R.W.'s home to request payments for rent and property taxes. As evidenced by photos obtained from security cameras that had been installed by Don Nemitz following

8.

R.W.'s April 23, 2023 complaint to the sheriff, Jones and Ross visited R.W.'s home on May 25 and 26, 2023, and on July 10, 2023. When Jones was asked on cross-examination whether she continued to go and see her father after the start of the CPO litigation, knowing that he did not want her to, Jones conceded that she did.

{¶ 19} After the parties rested their respective cases, the trial court instructed the jury on the elements of the offenses charged. Included in the instructions were definitions of various terms, including express and implied consent and "power of attorney." Mentioned in the trial court's definition of the term "power of attorney" was that "[t]he holder of a power of attorney has a fiduciary relationship with the principal," and that the fiduciary relationship "imposes a duty of loyalty to the principal." At defense counsel's request, a further instruction was given notifying the jury that under R.C. 1337.32, an agent holding a POA may be entitled to reimbursement of expenses incurred on behalf of the principal and to compensation that is reasonable under the circumstances.

{¶ 20} The jury conducted its deliberations and found Jones guilty of all charges.

### Assignments of Error

{¶ 21} On appeal, Jones asserts the following assignments of error:

I. The evidence is insufficient to sustain a conviction of theft, R.C. §2913.02(A)(2) for violating her fiduciary duty as the possessor of a Power of Attorney for her father as that document was not used to remove funds from their joint bank account.

II. The failure to present the jury with appropriate jury instructions that were warranted by the evidence presented at trial denied the appellant her right to a fair

trial as guaranteed by the due process clauses of the Ohio and Federal Constitutions.

III.  The evidence is insufficient to sustain a conviction of Aggravated Theft, Count Two, in violation of R.C. §2913.02(A)(3).

IV.  The evidence is insufficient to sustain a conviction of Count Three, Tampering with Witness, in violation of R.C. §2921.03(B) and Count Four, Intimidation, in violation of R.C. §2921.03(B).

V.  Defense counsel's representation at trial deprived Appellant Jones her right to the effective assistance of trial counsel.

VI.  The cumulative effect of errors deprived the appellant her right to a fair trial.

## Law and Analysis

**First Assignment of Error**

{¶ 22} Jones asserts in her first assignment of error that the evidence was insufficient to sustain her conviction for grand theft under R.C. 2913.02(A)(2). Her argument is essentially that she "could legally withdraw whatever amount she requested at anytime" from her father's joint accounts "without the use of a [POA]," and that she could not have violated her fiduciary duty as the possessor of a POA, because "none was owed."

{¶ 23} In reviewing a challenge to the sufficiency of the evidence, an appellate court views the evidence in a light most favorable to the prosecution and determines whether "'any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. Messer*, 2017-Ohio-1223, ¶ 16 (6th Dist.),

10.

quoting *State v. Smith*, 80 Ohio St.3d 89, 113 (1997). In making that determination, the appellate court does not weigh the evidence or assess the credibility of the witnesses. *Id.*, citing *State v. Were*, 2008-Ohio-2762, ¶ 132. The question of whether the evidence is sufficient to support a conviction is a question of law. *Id.*, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997).

{¶ 24} Jones insists that the State's theory of the case "was that [she] used a power of attorney to access her father's bank accounts and violated her fiduciary duty by taking more than necessary for her personal gain." According to appellant, she cannot be guilty of the grand theft count of the indictment because the evidence establishes that she did not actually use her POA to access R.W.'s joint accounts. The State agrees that the record is devoid of evidence suggesting that Jones used the POA to gain access to her father's bank accounts. But the State also maintains that it did not rely on, or need, Jones's POA to prove the charge. Instead, the State argues, evidence that Jones was named R.W.'s general and medical POA on the same day that she was deeded his home and named on his joint bank accounts "was entered at trial to show that the intent and expectation was that Jones would use R.W.'s money to pay his bills and help care for him."

{¶ 25} R.C. 2913.02(A)(2) provides that "[n]o person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services…[b]eyond the scope of the express or implied consent of the owner or person authorized to give consent." The State was, therefore, required to prove that Jones: (1) knowingly obtained or exerted control over R.W.'s money, (2) with purpose to

11.

deprive him of it, and that (3) she did so beyond the scope of R.W.'s express or implied consent.

{¶ 26} First, the State presented sufficient evidence to show that Jones knowingly obtained or exerted control over her father's money. "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result of will probably be of a certain nature." R.C. 2901.22(B). The State presented bank records showing that Jones withdrew large amounts of money from R.W.'s accounts and that she transferred significant sums of money from his accounts into her own personal account. Those records also showed that Jones had spent thousands of dollars from her father's accounts to make purchases on Amazon and from other miscellaneous places. By withdrawing, transferring, and otherwise spending from these accounts, Jones knowingly obtained and exerted control over her father's funds.

{¶ 27} Second, the State presented sufficient evidence to show that Jones acted with the purpose of depriving her father of his money. "Because intent exists 'within the privacy of a person's own thoughts, [it] is not susceptible of objective proof.'" *State v. Mattox*, 2025-Ohio-239, ¶ 32 (10th Dist.), quoting *State v. Garner*, 74 Ohio St.3d 49, 60 (1995). "Thus, intent may 'be determined from the surrounding facts and circumstances, and persons are presumed to have intended the natural, reasonable, and probable consequences of their voluntary acts.'" *Mattox* at ¶ 32, quoting *Garner* at 60. As noted above, there was extensive evidence that Jones made large withdrawals, transfers, and purchases from her father's accounts, leaving him with almost nothing. She is presumed to have intended the natural consequence of these acts – which, of course, would be to

12.

deprive her father of the money that was removed from his accounts. Each time she made a purchase on Amazon, for example, the natural consequence was that her father would lose that money forever. Likewise, the natural consequence of making large withdrawals and transfers of her father's money without providing an account of where the money went was that the money was -- at least as far as her father's interest was concerned -- permanently lost.

{¶ 28} Finally, the State presented sufficient evidence to establish that Jones acted beyond the scope of her express or implied consent. Jones argues that because R.W. named her on his joint bank accounts, she could legally withdraw whatever amount she wanted at any time. However, "a conviction for theft under R.C. 2913.02(A) may arise from a joint account holder's actions depriving another holder of funds." *Mattox* at ¶ 36 (additional citations omitted). Relevant to the facts of this case, R.C. 2913.02(A)(2) does not require evidence that Jones used a power of attorney to gain access to the funds. *State v. Woodburn*, 2019-Ohio-2757, ¶ 25 (4th Dist.).

{¶ 29} "'The existence of a joint and survivorship bank account raises a rebuttable presumption that co-owners of the account share equally in the ownership of the funds on deposit.'" *Estate of Cowling v. Estate of Cowling*, 2006-Ohio-2418, ¶ 12, quoting *Vetter v. Hampton*, 54 Ohio St.2d 227 (1978), paragraph three of the syllabus. "This presumption applies in the absence of evidence to the contrary." *Id.* (Additional citations omitted.) "'A joint and survivorship account belongs, during the lifetime of all parties, to the parties in proportion to the net contributions by each to the sums on deposit, unless

13.

there is clear and convincing evidence of a different intent.'" *Id.*, quoting *In re Estate of Thompson*, 66 Ohio St.2d 433 (1981), paragraph one of the syllabus.

{¶ 30} Here, the evidence is undisputed that the bank accounts were funded by money that belonged to R.W., including his inheritance and social security deposits. This evidence was sufficient to rebut any presumption that Jones shared equally in the ownership of the account funds.

{¶ 31} Further, while there is no doubt that Jones had consent to obtain and exert control over R.W.'s funds -- "'[h]olders of a joint an survivorship account 'typically each have the right to withdraw all the funds from an account'" -- this does not answer the question of whether, in doing so, she acted within the scope of R.W.'s consent. *Woodburn* at ¶ 22, quoting *Ingram v. Hocking Valley Bank*, 125 Ohio App.3d 210, 218 (4th Dist. 1977). If an individual who lawfully has control over property with consent begins to use that property ""'for something outside what the owner specifically authorized, the individual has gone beyond the owner's consent. The [theft] statute allows for this precise situation in R.C. 2913.02(A)(2)."'" *Id.* at ¶ 24, quoting *State v. Roberts*, 2015-Ohio-2716, ¶ 13 (2d Dist.), quoting *State v. Dortch*, 1999 WL 819569, *4 (2d Dist. Oct. 15, 1999).

{¶ 32} Jones contends that "the trial testimony did not disclose the specific nature of the agreement" between herself and her father. Notably, the law does not require written instructions from R.W. regarding the use of his funds. *See Woodburn*, 2019-Ohio-2757, at ¶ 25. This court has found that "a variety of evidence may be used by the state to prove that a defendant acted beyond the scope of the express or implied consent of the

14.

owner of property over which the defendant obtained or exerted control." *State v. Craig*, 2021-Ohio-2790, ¶ 89 (6th Dist.). "This evidence includes, without limitation: (1) the defendant's writing and endorsing of checks payable to the defendant from the owner's bank account without justification…; [and] (2) the defendant's unauthorized withdrawal of funds from the owner's bank account and subsequent personal use of such funds without the owner's permission…." *Id.* (Internal citations omitted.)

{¶ 33} Here, the State presented evidence to establish that Jones's exercise of control over her father's funds exceeded the scope of her express or implied consent. R.W. testified that he put Jones on his bank accounts for the same reasons that he appointed her his POA and deeded her his house – so she could take care of him. Mary testified that she explained Jones's responsibilities to her and told her that R.W. would need help paying his bills. Jones herself admitted that she was aware that the purpose of the POA was to pay her father's bills, and not to enrich herself. Yet police determined that between April 2022 and March 2023, Jones made numerous unauthorized cash withdrawals and transfers from R.W.'s accounts totaling $36,997. R.W.'s testimony unequivocally confirmed that these withdrawals and transfers were not authorized. Police also determined that Jones had spent $7,429.20 of her father's money on numerous Amazon purchases that were made during the same time period. R.W. testified that these expenditures, like the withdrawals and transfers, were unauthorized. Finally, police identified an additional $2,558.88 in unauthorized purchases that Jones had made using her father's money. Altogether, police determined that during the time period in question, Jones had made unauthorized use of $47,674.89 of her father's money. Jones never

provided any information or receipts to suggest what any of this money was used for. Although Jones disputed the State's evidence, claiming her father had authorized her to use the funds, "[t]he jury was free to accept or reject any and all of the evidence offered by the parties and [to] assess the witness's credibility." *State v. Cobb*, 2015-Ohio-3661, ¶ 46.

{¶ 34} When viewed in a light most favorable to the State, the evidence that was produced at trial would allow any rational juror to conclude, beyond a reasonable doubt, that Jones knowingly obtained or exerted control over $47,674.89 of her father's funds beyond his express or implied consent with the purpose to deprive him of it. Jones's first assignment of error is therefore found not well-taken.

**Second Assignment of Error**

{¶ 35} Jones argues in her second assignment of error that the trial court provided incomplete and erroneous jury instructions with respect to the grand theft charge. Specifically, she contends that the trial court should have instructed the jury that R.W.'s bank accounts were joint accounts, and that the issue was "whether, as a co-owner, Jones's withdrawals and purchases went beyond the consent or implied consent of her father." She further contends that the jury should have been instructed "about the law regarding the ownership of the funds within a joint bank account," and that the trial court's "incorrect instructions" left the jury "unable to even consider the issues involved with a joint bank account."

16.

{¶ 36} "'A trial court is obligated to provide jury instructions that correctly and completely state the law.'" *State v. Nye*, 2021-Ohio-2557, ¶ 14 (6th Dist.), quoting *Cromer v. Children's Hosp. Med. Ctr. of Akron*, 2015-Ohio-229, ¶ 22, citing *Sharp v. Norfolk & W. Ry. Co.*, 72 Ohio St.3d 307 (1995). "A jury instruction is proper when '(1) the instruction is relevant to the facts of the case; (2) the instruction gives a correct statement of the relevant law; and (3) the instruction is not covered in the general charge to the jury.'" *State v. Yerena*, 2016-Ohio-7635, ¶ 19 (6th Dist.), quoting *State v. Kovacic,* 2012–Ohio–219, ¶ 15 (11th Dist.). In addition, jury instructions "'"must be given when they are correct, pertinent, and timely presented.'" *State v. Griffin*, 2014-Ohio-4767, ¶ 5, quoting *State v. Joy,* 74 Ohio St.3d 178, 181 (1995), citing *Cincinnati v. Epperson,* 20 Ohio St.2d 59 (1969), paragraph one of the syllabus. Finally, a "'court must give all instructions that are relevant and necessary for the jury to weigh the evidence and discharge its duty as the factfinder.'" *Id.,* quoting *Joy* at 181*,* citing *State v. Comen,* 50 Ohio St.3d 206, (1990), paragraph two of the syllabus.

{¶ 37} In reviewing this assignment of error, we note that Jones raised no objection in the trial court to the instruction on grand theft. "It is well-settled that, absent plain error, failure to object to a jury instruction, as required by Crim.R. 30, constitutes a waiver of any claim of error as to the instruction." *State v. Jones*, 2009-Ohio-6501, ¶ 37 (6th Dist.), citing *State v. Long*, 53 Ohio St.2d 91, 96-97. (Additional citation omitted.) "'In order to establish plain error, appellant must show that but for the error, the outcome of the trial clearly would have been otherwise.'" *Id.*, quoting *State v. Herrera,* 2006-Ohio-3053 (6th Dist.). "'Notice of plain error under Crim.R. 52(B) is to be taken with the

17.

utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *Id.*, citing *Long* at paragraph three of the syllabus. (Additional citations omitted.)

{¶ 38} Here, the trial court instructed the jury in accordance with 2 OJI, CR § 513.02, which applies to thefts. Specifically, the trial court instructed the jury:

> Count 1 of the indictment the Defendant is charged with Grand Theft. Before you can find the Defendant guilty of this offense, you must find beyond a reasonable doubt – all of the following – that, number 1, On or about March 28, 2022 through April 17, 2023, in Erie County, Ohio, the Defendant knowingly; number 4, obtained or exerted control over property or services; number 5, beyond the scope of the express or implied consent of the owner or person authorized to give consent; and, number 6, with the purpose to deprive the owner of the property or services.
>
> You must consider the offense charged in the indictment. The State must prove each of the essential elements beyond a reasonable doubt.

{¶ 39} Where, as here, "a jury instruction tracks with the language of the Ohio Jury Instructions, there is no plain error." *See State v. Ybarra*, 2017-Ohio-9144, ¶ 22 (5th Dist.), citing *State v. Schell*, 2017-Ohio-2641, ¶ 40 (9th Dist.). (Additional citation omitted.)

{¶ 40} Further, as explained above, in cases like this, involving joint accounts where the defendant clearly had consent to obtain and exert control over a victim's property, the issue is not who owns the funds within the account, but rather whether the defendant -- who lawfully has control over the property by virtue of his or her status as a holder of the account -- has used the property for something outside of that which was

18.

authorized by the owner. *See Woodburn* at ¶ 22-24. Again, "[t]he [theft] statute allows for this precise situation in R.C. 2913.02(A)(2)." *Id.*

{¶ 41} To the extent that Jones argues that the trial court failed to instruct the jury on the issue of implied consent, we point to the trial court's instruction on consent, which provided:

> Consent. Consent may be either express or implied. Express consent is determined by the written or spoken words of the person involved. Implied consent is determined by the facts and circumstances that surround those involved, including their words and acts, from which you may infer that consent was given to the Defendant.

As the jury was, in fact, instructed as to both implied and express consent, Jones's argument to the contrary is dismissed as meritless.

{¶ 42} Finally, Jones takes issue with the definitions of "power of attorney" and "compensation" that were provided by the trial court in its instructions. Specifically, the trial court instructed:

> Power of attorney. A power of attorney is a written authorization to an agent to perform specific acts on behalf of the principal. It is an agency created by a formal instrument in writing and for most purposes is not required, although certain acts must be authorized by such written power. The holder of a power of attorney has a fiduciary relationship with the principal. This fiduciary relationship imposes a duty of loyalty to the principal.

> Compensation. Under Section 1337.32 of the Ohio Revises Code, unless the power of attorney otherwise provides, an agent is entitled to a reimbursement of expenses incurred on behalf of the principal, and to compensation that is reasonable under the circumstances.

{¶ 43} Jones characterizes the power of attorney instruction, with its attendant "duty of loyalty" as irrelevant, unwarranted, and misleading in this case where Jones used

19.

her authority as a joint account holder, rather than as holder of a POA, to access R.W.'s funds. We note, however, that the Eighth District Court of Appeals in *Meehan v. Meehan*, 2023-Ohio-2772 (8th Dist.) has previously determined in a similar case involving a defendant who wrote checks as a joint checking account holder, rather than as the holder of a power of attorney, that the defendant, as the principal's agent, was still bound by the fiduciary duties of the power of attorney. *Id.* at ¶ 44. Because a "person holding a power of attorney has a fiduciary relationship with his or her principal and is not required to have used the power of attorney for a confidential or fiduciary relationship to arise," we do not find that the power of attorney instruction was irrelevant, unwarranted, or misleading. *See id.* (Additional citations omitted.)

{¶ 44} Moreover, although use of the POA was not necessary to prove that Jones was guilty of grand theft, evidence concerning the POA, which was offered to demonstrate the intent and expectation that Jones would use her father's money to pay his bills and help care for him, went to the key issue of consent.

{¶ 45} The trial court's inclusion of the instruction, which was a correct statement of the law and was appropriate to the facts of the case, was not error. Even if it were error, such error did not clearly affect the outcome of the case.

{¶ 46} Finally, Jones argues that the related compensation instruction "was not a relevant consideration in a joint account dispute," and, further, that Jones did not testify that her withdrawals from the joint account were for compensation for work performed for her father.

20.

{¶ 47} As an initial matter, we note that Jones herself requested the definition of compensation that was ultimately used by the trial court. "Ohio courts have held that '[i]n reviewing a claim on appeal that a jury instruction requested by the defendant and given by the trial court was reversible error, under the "invited error doctrine," a party may not request a jury instruction and then later complain on appeal that [the] requested instruction was given.'" *State v. O.A.B.,* 2020-Ohio-547, ¶ 32 (10th Dist.), quoting *State v. Brown*, 2013-Ohio-3608, ¶ 53 (5th Dist.), citing *Walker v. State,* 2007-Ohio-5262, ¶ 51 (5th Dist.).

{¶ 48} Moreover, even if the compensation instruction were given in error, it did not clearly affect the outcome of this case, and so did not amount to plain error. Appellant's second assignment of error is found not well-taken.

**Third Assignment of Error**

{¶ 49} In her third assignment of error, Jones contends that there is insufficient evidence to support her conviction for aggravated theft, in violation of R.C. 2913.02(A)(3). Under R.C. 2913.02(A)(3), "[n]o person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services…[b]y deception." "Deception" means "knowingly deceiving another or causing another to be deceived by any false or misleading representation, by withholding information, by preventing another from acquiring information, or by any other conduct, act, or omission that creates, confirms, or perpetuates a false impression in another, including a false impression as to law, value, state of mind, or other objective or subjective fact." R.C. 2913.01(A).

21.

{¶ 50} Jones argues that the evidence was insufficient to establish "that any deception was involved in the transfer of the Maple Avenue residence." Specifically, she claims that "[w]hen viewing the evidence in a light most favorable to the prosecution, there is no evidence that Jones had any intention of stealing her father's house at the time he signed over the deed."

{¶ 51} "'[I]ntent may be inferred from the circumstances surrounding the crime.'" *State v. Herring*, 94 Ohio St.3d 245, 266 (2002). "Because intent dwells in the mind of the accused, an intent to act can be proven from the surrounding facts and circumstances." *State v. Fasino*, 2015-Ohio-2265, ¶ 15, citing *State v. Treesh*, 90 Ohio St.3d 460, 484-485 (2001). In fact, "when we delve into questions of intent, circumstantial evidence is often all that we have." *State v. Barnthouse*, 2019-Ohio-5209, ¶ 16.

{¶ 52} Here, R.W. testified that he executed the POA, named Jones on his bank accounts, and deeded her the Maple Ave. property with an understanding that she would take care of him and use these things to his benefit, not hers. These actions were all taken contemporaneously. Mary testified that she had spoken with Jones about her responsibilities, and Jones confirmed that she knew the POA was for purposes of paying her father's bills. At the time, Jones had nearly exhausted her home equity credit line of $30,000. On the very next day after Jones was named her father's POA, was added to his joint accounts, and was deeded his home, she withdrew $500 from her father's bank account. By June 1, 2022, just over two months later, Jones had withdrawn more than $22,000 from his bank accounts, not including any of her Amazon purchases. This

22.

continued over the next year, with Jones withdrawing, spending, and transferring large sums of money out of her father's accounts – eventually leaving him with just $103.16. R.W. testified that these withdrawals, transfers, and expenditures were not authorized. Jones, for her part, never provided any explanation, information, or receipts to show how any of the money was used. Within a week of R.W. removing Jones from his bank accounts, Jones had her brother, Ross, bring her father a lease agreement that would require him to pay her $1,200 in rent each month, beginning immediately. Under the circumstances of this case, the jury could reasonably have concluded that at the time the Maple Ave. property was transferred to her, Jones did not intend to use it to her father's benefit, and that she knowingly deceived her father by making a false or misleading representation regarding the same. Appellant's third assignment of error is found not well-taken.

**Fourth Assignment of Error**

{¶ 53} Appellant argues in her fourth assignment of error that there is insufficient evidence to support her convictions for tampering with evidence, in violation of R.C. 2921.12(A)(2), and intimidation, in violation of R.C. 2921.03(A).

### a. Tampering with evidence

{¶ 54} Tampering with evidence, under R.C. 2921.12(A)(2), provides that "[n]o person, knowing that an official proceeding or investigation is in progress, or is about to be or likely to be instituted, shall…[m]ake, present, or use any record, document, or thing, knowing it to be false and with purpose to mislead a public official who is or may

23.

be engaged in such proceeding or investigation, or with purpose to corrupt the outcome of any such proceeding or investigation."

{¶ 55} The facts in support of this conviction are as follows. Jones met with Dan McLaughlin of Serving Our Seniors on April 13, 2023, at which time he described the concerns about her use of R.W.'s money. McLaughlin advised Jones that the matter could be resolved if she contacted him by April 14, 2023, but that if she failed to do so the matter would be referred to the sheriff's department and, potentially, to the grand jury. Jones did not contact McLaughlin on April 14, 2023. Instead, her brother brought R.W. a typed letter that she had prepared, stating that R.W. was "dropping any and all charges against" her for "elder abuse or mishandling of [his] finances." R.W. signed the letter because he felt "[v]ery intimidated," as his son was recording the encounter and telling him that it was in his best interest to do so. The letter further stated that R.W. "had approved all transactions that [had] occurred in [his] Erie County Community Federal Credit Union accounts," that he knew that Jones had his "best interest to pay [his] bills and complete the maintenance requirements of [his] equipment and the automobile that [he drove]," that she "always [made] sure that [he did] not go without," that she "made sure [he] had running water and propane to heat [his] home," that she "made sure that [he had] a place to live comfortably and with freedom to live [his] life," that she was "always helping" him, and that she took him "to doctor appointments, [had] cleaned [his] home, care[d] for [his] lawn, oil changes and other appoint[ments] such as social security, disability and VA." R.W. testified that all of these statements were false. In fact, at the time the letter was presented to R.W., his home had been without hot water for three

24.

months, and his gas bill had not been paid. Jones, through her attorney, subsequently presented this letter to the magistrate at the April 26, 2023 CPO pre-trial hearing. When the magistrate asked R.W. whether he wanted to dismiss the petition, R.W. Stated that he did not.

{¶ 56} When viewed in the light most favorable to the prosecution, this evidence was sufficient to allow a rational trier of fact to find beyond a reasonable doubt that Jones, knowing that the CPO proceeding was in progress and that a criminal investigation was or was likely to be instituted, made and presented the non-prosecution letter to the magistrate with the purpose of corrupting the proceeding.

### b. Intimidation

{¶ 57} Intimidation, under R.C. 2921.03(A), provides that "[n]o person, knowingly and by force, by unlawful threat of harm to any person or property, or by filing, recording, or otherwise using a materially false or fraudulent writing with malicious purpose, in bad faith, or in a wanton or reckless manner, shall attempt to influence, intimidate, or hinder a public servant, a party official, or an attorney or witness involved in a civil action or proceeding in the discharge of the person's the duties of the public servant, party official, attorney, or witness."

{¶ 58} Jones contends there was insufficient evidence of intimidation because at the time the non-prosecution letter was signed, "there were no criminal charges," and, further, no civil proceeding existed or was anticipated. The provisions of the statute, however, do not require either of these things.

25.

{¶ 59} The basis of Jones's intimidation conviction was her use of the allegedly false or fraudulent non-prosecution letter in the CPO proceeding. The same facts that supported the tampering with evidence charge also support the intimidation charge, inasmuch as they are sufficient to allow a rational trier of fact to find beyond a reasonable doubt that Jones, by using a materially false or fraudulent writing, in bad faith, or in a wanton or reckless manner, attempted to influence the magistrate involved in the CPO proceeding in the discharge of his duties. Jones's fourth assignment of error is therefore found not well-taken.

**Fifth Assignment of Error**

{¶ 60} In her fifth assignment of error, Jones contends that her trial counsel was ineffective for not objecting to certain evidence, testimony, and argument, and by failing to ensure that the jury was properly instructed.

{¶ 61} To establish a claim of ineffective assistance of counsel, a defendant must show "(1) deficient performance by counsel, that is, performance falling below an objective standard of reasonable representation, and (2) prejudice—a reasonable probability that, but for counsel's errors, the result would have been different." *State v. Myers*, 2018-Ohio-1903, ¶ 183, citing *Strickland v. Washington*, 466 U.S. 668, 687-688, 694 (1984). "When considering counsel's performance, 'a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."'" *State*

26.

*v. Meyers,* 2025-Ohio-5824, ¶¶ 7-8 (6th Dist.), quoting *Strickland* at 689, quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955).

### a. Power of attorney

{¶ 62} Jones first claims that her trial counsel was ineffective for failing "to recognize or argue that [Jones] never used the power of attorney" and for failing to recognize that because Jones never used the power of attorney, "there was no merit to the power of attorney/fiduciary duty violation issue."

{¶ 63} At the outset of the case, defense counsel did state in its opening argument that Jones never used the power of attorney. But by closing argument, after all the evidence had been presented, including evidence of the POA, defense counsel argued more to the effect that Jones simply "didn't know anything about being a power of attorney," that she did the best she could in an unfamiliar situation, and that her father had, in fact, authorized her expenditures but subsequently forgot that he had done so.

{¶ 64} To begin, we are mindful that "[i]ssues which are arguably a matter of trial tactics and strategies do not constitute ineffective assistance," *State v. Brock*, 2009-Ohio-4590, ¶ 14 (6th Dist.), and that "[t]o justify a finding of ineffective assistance of counsel, the appellant must overcome a strong presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *State v. Carter*, 72 Ohio St.3d 545, 558 (1995), citing *Strickland* at 689.

{¶ 65} In this case, although it was agreed by both parties that Jones did not act pursuant to the POA, evidence of the POA was offered by the State to demonstrate the intent and expectation that Jones would use her father's money to pay his bills and help

27.

care for him rather than to her own benefit. Because, as discussed above, the State did not rely on Jones using the POA to access the accounts in order to prove that she was guilty of grand theft, defense counsel was not deficient for failing to further emphasize that fact.

{¶ 66} Moreover -- again, as discussed above -- the mere fact that Jones wrote checks as a joint checking account holder, rather than as the holder of a POA, did not permit her to sidestep her fiduciary relationship with her father -- as R.W.'s agent, Jones remained bound by the fiduciary duties of a POA, even if she never used that power. *See Meehan,* 2023-Ohio-2772, ¶ 44. Defense counsel did not err in trying to convince the jury that Jones did not knowingly violate this duty.

{¶ 67} Not only has Jones failed to establish that her attorney's performance was deficient, she has also failed to show a reasonable probability that had counsel further emphasized the fact that she never used the power of attorney to access the funds in her father's accounts, the result of the proceedings would have been any different.

### b. Jury instructions

{¶ 68} Jones also argues that her trial counsel was ineffective for failing to ensure proper jury instructions as to the grand theft count of the indictment. According to Jones, defense counsel should have objected to the instruction on power of attorney and, further, should have requested instructions relevant to a joint account withdrawal by a co-owner. She points out that there was no evidence of her using the power of attorney to access bank accounts and that she made no claim that her "usage from those accounts" was

28.

compensation for her duties as the holder of a POA. Instead, she stresses, once again, that her usage of her father's funds was as a co-owner of the joint account.

{¶ 69} As previously explained, the trial court's instructions were in accordance with the Ohio Jury Instruction that applies to theft. And the definition of power of attorney was a correct statement of the law and was properly provided under the facts of the case.

{¶ 70} Defense counsel's strategy at trial was clearly to embrace Jones's role as her father's POA -- despite the fact that she may not have performed perfectly in that capacity -- and, further, to emphasize that Jones did not need to exercise that power because she was named on her father's joint accounts. But whether she accessed the funds pursuant to her POA or as co-owner of the joint accounts, the issue was always whether, in doing so, she exceeded the authority that was given to her by way of her father's consent. Under either theory, she was bound by a fiduciary duty to her father. *See Meehan,* 2023-Ohio-2772, ¶ 44.

{¶ 71} At trial, counsel attempted to persuade the jury that Jones's use of her father's money was authorized. And by requesting the compensation portion of the power of attorney instruction, he was giving the jury an additional reason to find in Jones's favor. Defense counsel's trial strategy was sound in this respect and did nothing to alter the outcome in this case.

### c. Victim impact testimony

{¶ 72} Jones next claims that her trial counsel was ineffective in failing to object to victim-impact testimony, which she claims was both irrelevant and unfairly

29.

prejudicial. Specifically, she challenges testimony and evidence that R.W. was in poor health and felt suicidal. She further complains that some of this evidence was hearsay.

**{¶ 73}** "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid.R. 401. "Although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issue, or of misleading the jury. Evid.R. 403.

**{¶ 74}** In arguing that evidence of R.W.'s physical and mental health was irrelevant, Jones relies on an isolated statement by the Ohio Supreme Court in *State v. Fautenberry*, 72 Ohio St.3d 435, that "[t]rue victim-impact evidence, pursuant to the terms of R.C. 2930.13, 2930.14 and 2947.051, shall be considered by the trial court prior to imposing sentence upon a defendant, not during the guilt phase of the proceedings." *Id.* at 440. But the Supreme Court also went on to recognize:

> Evidence relating to the facts attendant to the offense, however, is clearly admissible during the guilt phase. As a result, we find that evidence which depicts *both* the circumstances surrounding the commission of the [crime] and also the impact of the [crime] on the victim's family may be admissible during *both* the guilt and the sentencing phases.

*Id.*; *see also State v. McKnight*, 2005-Ohio-6046, ¶ 98 (Evidence relating to the facts attendant to the offense is "clearly admissible" during the guilt phase, even though it might be characterized as victim-impact evidence.).

30.

{¶ 75} Here, the evidence that R.W. was in poor health and felt suicidal was part of the circumstances surrounding the commission of the offenses. In fact, the defense itself, through Jones's own testimony, highlighted R.W.'s poor health as a trial strategy, suggesting the ways in which R.W.'s alcoholism negatively impacted and burdened Jones's life.

{¶ 76} Regardless of defense counsel's use of the testimony, evidence of R.W.'s poor health was relevant to the grand theft count of the indictment in that it showed that Jones knowingly obtained or exerted control over the funds in R.W.'s accounts beyond the scope of the express or implied consent. The evidence was also relevant to the aggravated theft count of the indictment as it went to whether Jones obtained or exerted control over the Maple Ave. property by knowingly deceiving her father. Finally, the evidence of R.W.'s poor health and suicidal thoughts was relevant to both the tampering with evidence and intimidation counts. This evidence went towards establishing that Jones knew that the non-prosecution letter was false, and that she had acted in bad faith, or in a wanton or reckless manner, by presenting it to the magistrate at the CPO hearing, with the purpose to mislead the magistrate and influence the discharge of his duties. Jones has failed to establish that trial counsel was ineffective for failing to object to evidence that was relevant to each and every charge.

{¶ 77} Jones next argues that evidence that R.W. was advised by medical personnel to stay away from Jones was hearsay and should have been objected to. R.W. testified that when he was released from the hospital in May 2023, he was advised to

31.

avoid contact with this daughter. This is represented in his medical records, which were also entered into evidence.

{¶ 78} In all of this, Jones has failed to demonstrate the requisite prejudice with respect to the admission of the identified victim-impact evidence. That is, there is not a reasonable probability that the outcome of the trial would have been any different had any of this evidence been excluded.

### d. Civil protection filing

{¶ 79} Jones also contends that her trial counsel was ineffective for failing to object to evidence relating to R.W.'s attempt to obtain a CPO and by not requesting a limiting instruction regarding the same. She claims this evidence was not relevant because a hearing was never held on the petition, a protection order was never granted, and the petition was voluntarily dismissed.

{¶ 80} As explained above, although the CPO was not granted at an ex parte hearing, the matter was set for a pre-trial hearing on April 26, 2023. At that hearing, Jones appeared and used the April 14, 2023 non-prosecution letter that she had pressured R.W. to sign as evidence. This evidence was relevant to both the tampering with evidence and intimidation counts, despite the fact that the petition was subsequently dismissed voluntarily on July 21, 2023. Defense counsel was therefore not deficient for failing to object to this evidence. Furthermore, Jones has not demonstrated a reasonable probability that had her counsel so objected, such would have impacted the outcome of the trial.

32.

### e. Security cameras

{¶ 81} Jones next contends that her trial counsel was ineffective for failing to object to testimony by R.W.'s brother, Don, that he had installed security cameras at R.W.'s home. According to Jones, such testimony was unfairly prejudicial.

{¶ 82} At trial, Don testified that he placed some security cameras at R.W.'s house. He stated that people were going into R.W.'s house when R.W. was not home, and that they had reported the situation to the sheriff, who advised them to put up the cameras. He then authenticated photos that were taken from the cameras on May 25 and 26, 2023 and July 10, 2023, showing Jones and her brother, Ross, at R.W.'s home. All three visits occurred before R.W. had dismissed his petition for a civil protection order. The evidence -- including evidence of the security cameras and the images they captured -- was relevant to show Jones's continued efforts to collect rent money from her father for the Maple Ave. property, despite the ongoing CPO proceedings and despite Jones's knowledge that she had drained her father's bank accounts down to just over $100. The evidence was not unfairly prejudicial under Evid.R. 403. Counsel was, therefore, not deficient in not objecting to its admission. Furthermore, Jones has not established a reasonable probability that the outcome of the proceeding would have been different had counsel so objected.

### f. Closing argument

{¶ 83} Finally, Jones claims that her trial counsel was ineffective for failing to object to the prosecutor "improperly argu[ing] that the power of attorney was used to

33.

facilitate both the withdrawal of the money from the joint account and the transfer of the deed of the Maple Avenue property."

{¶ 84} We note at the start of our analysis that "prosecutors are entitled to considerable latitude in opening and closing arguments." *State v. Boles*, 2009-Ohio-512, ¶ 47 (6th Dist.), citing *State v. Ballew*, 76 Ohio St.3d 244 (1981). "During closing, a prosecutor may comment on what the evidence has shown and what reasonable inferences may be drawn from the evidence." *State v. Norales-Martinez*, 2018-Ohio-4356, ¶ 44, citing *Boles* ¶ 47.

{¶ 85} In making her claim, Jones points only to page 408 of the trial transcript, which includes several of the following statements that were made by the prosecutor:

> But, any rate, so that's important in an email exchange, but also what's important she indicated, you know, can I still operate as power of attorney if that's the case to pay his bills. So she knows what that's for. She knows what the purpose of the power of attorney is. And, of course, common sense would dictate that's the purpose of the power of attorney.
>
> So also the deed was transferred to Tara, and also she was placed on [R.W.'s] accounts, the 406-00 and the 406-09. She was placed on those accounts and, again, it's critical to understanding, this all happened on the same day. The documents were sent to her and prepared by the same attorney, the two POAs, which is one for health care, one for general POA, and also the deed. Not only those were prepared by the attorney for the purpose of acting as a POA, but also it happened at the bank they signed it at the same time. We know that because Jennifer Gast had testified that Michael Graham was a loan officer there, and notarized both the documents, the POAs, and the deed, and he also added Tara to the joint account which, again, done contemporaneous, they're linked. They're one and the same purpose.

{¶ 86} Contrary to Jones's suggestion, the prosecutor was not arguing that the POA was used to withdraw money from the joint accounts or to transfer the deed to the

34.

Maple Ave. property. Instead, the prosecutor was noting the relationship between all three events – the signing of the POAs, the deed transfer, and adding Jones to the joint accounts all occurred on the same date. As the prosecutor's statements note, the interconnectedness of these events demonstrate that they were all done with the expectation that Jones would use the bank accounts, the Maple Ave. property, and the POAs to take care of her father, rather than herself. This was a reasonable inference based on the evidence presented at trial. Accordingly, defense counsel was not ineffective for not objecting to the statements during the prosecutor's closing. Furthermore, Jones has not demonstrated a reasonable probability that doing so would have impacted the outcome of the proceedings. Accordingly, Jones's fifth assignment of error is found not well-taken.

**Sixth Assignment of Error**

{¶ 87} In her sixth and final assignment of error, Jones contends that the cumulative error doctrine requires reversal of her convictions. The cumulative error doctrine provides that "a conviction will be reversed when the cumulative effect of errors in a trial deprives a defendant of a fair trial even though each of the numerous instances of trial court error does not individually constitute cause for reversal." *State v. McKelton*, 2016-Ohio-5735, ¶ 321, quoting *State v. Powell,* 2012-Ohio-2577, ¶ 223. For the doctrine to apply, there must be findings "that multiple errors were committed at trial" and "that there is a reasonable probability the outcome of the trial would have been different but

35.

for the combination of the separately harmless errors." *State v. Moore*, 2019-Ohio-3705, ¶ 87 (6th Dist.).

{¶ 88} As explained above, Jones has failed to demonstrate that multiple errors were committed in the present case. Accordingly, there can be no cumulative error. *See State v. Owens*, 2025-Ohio-2035, ¶ 140 (absent multiple errors at trial, there could be no cumulative error). Jones's sixth assignment of error is therefore found not well-taken.

**Conclusion**

{¶ 89} The judgment of the Erie County Court of Common Pleas is affirmed. Appellant is ordered to pay the costs of appeal pursuant to App.R. 24.

Judgment Affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Thomas J. Osowik, P.J.
_____
JUDGE

Gene A. Zmuda, J.
_____
JUDGE

Myron C. Duhart, J.
CONCUR.
_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.